IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| **BLUEALLELE CORPORATION** | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  24-791 |
| | : | |
| **INTELLIA THERAPEUTICS, INC.** | : | |

## MEMORANDUM

**MURPHY, J.**                                                                                    **December 9, 2024**

This is a patent case, and the parties are biotechnology companies.  BlueAllele accuses Intellia of infringing its patents relating to gene-editing technology.  Intellia met the complaint with a motion to dismiss asking us to apply the Hatch-Waxman Act's safe harbor as a matter of law.  *See* 35 U.S.C. § 271(e)(1).  The gist of the safe harbor is that companies are free to use patented drugs and devices when seeking FDA approval to market their own versions of the drugs and devices.  But not all situations are as simple as a competitor preparing to launch a copy of the patented product right after the patent expires.  Disputes arise, as here, when the accused instrumentalities have multiple uses.  And because the safe harbor is an affirmative defense, the movant can only clear the board if the allegations unquestionably make out the defense.  In its complaint, BlueAllelle alleges that aspects of the accused gene editing technology did not need — and were not used for — FDA approval.  For essentially that reason, Intellia's motion is **DENIED**.

**I.        Procedural and factual background**[1]

This case involves gene-editing technology.  Gene editing refers to a class of methods where particular DNA sequences within a cell's genome may be targeted and modified for

---

[1] We draw these factual allegations from plaintiff's complaint and accept them as true. DI 1; *see Doe v. Princeton Univ.*, 30 F.4th 335, 340 (3d Cir. 2022).

research or therapeutic purposes.  DI 1 ¶ 13.  Bi-directional insertion templates (BDITs) are a gene editing technology that allow efficient DNA editing with minimal byproducts.  *Id.* ¶ 16.  BlueAllele is a Minnesota company that aims to develop treatments for genetic diseases.  *Id.* ¶¶ 2, 15-16.  It owns U.S. Patent Nos. 11,091,756, 11,254,930, and 11,365,407 (the "asserted patents"), which claim BDIT technology.  *Id.* ¶¶ 1, 8-11.

Intellia is a Massachusetts biotechnology company focused on developing and commercializing gene editing therapeutics.  *Id.* ¶ 18.  BlueAllele alleges that Intellia infringes the asserted patents by "making and using the [BDITs] . . . for the research, identification, optimization and development of commercially-viable therapeutic candidates."  *Id.* ¶ 28.  According to the complaint, Intellia's infringing conduct involves "(1) the experimentation and optimization related to the identification of NTLA-3001, Hemophilia A, Hemophilia B, and other therapeutic candidates; (2) using and making of circular plasmids that comprise [BDITs] that are used as tools for manufacturing of therapeutic candidates; and (3) using and making of mammalian cells with [BDITs] integrated into their genome."  *Id.* ¶ 20.

In response to BlueAllele's complaint in this case, Intellia filed a motion to dismiss the complaint for failure to state a claim because 35 U.S.C. § 271(e)(1) (hereafter "the Safe Harbor") immunizes Intellia's use of BDITs against the claims of infringement.  DI 20.  Intellia argues that BDIT is a patented invention integrated into therapeutic candidates subject to FDA approval, and its allegedly infringing acts are reasonably related to its submission for FDA approval.  DI 21 at 2.  Additionally, Intellia points out that it used BDIT well before the asserted patents issued, which is all the more reason its late-stage development of therapeutic candidates falls within the Safe Harbor.  *Id.*  BlueAllele opposes because it believes the Safe Harbor does not apply to all of

2

Intellia's activities and Intellia uses BDITs for "basic research" and as a "research tool." DI 27 at 1-2. We held oral argument. For the reasons explained below, we deny the motion to dismiss.

## II.    Standard of review

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim appears plausible on its face when the facts pled enable the court to reasonably infer that the defendant is liable for the alleged misconduct. *Id*. In assessing the plausibility of a claim, the court must take the well-pled facts to be true, construe those facts in the light most favorable to the plaintiff, and draw all reasonable inferences from them. *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 790 (3d Cir. 2016). The Court may dismiss a complaint in light of an affirmative defense only when the defense is established by the complaint. *Jones v. Bock*, 549 U.S. 199, 215 (2007). It is well established that "a complaint need not anticipate or overcome affirmative defenses." *Schmidt v. Skolas*, 770 F.3d 241, 248 (3d Cir. 2014).

## III.   Analysis

Congress enacted the Safe Harbor at least in part as a response to a perceived extension to patent terms for patented technologies regulated by the FDA arising from the time needed to obtain regulatory approval for market entry. *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 670 (1990). Because the testing and development of information required to apply for FDA approval cannot commence until a patent's term expires, the "the patentee's *de facto* monopoly would continue for an often substantial period until regulatory approval was obtained." *Id*. The Safe Harbor provides that:

3

> It shall not be an act of infringement to make, use, offer to sell, or sell within the United States or import into the United States a *patented invention . . . solely for uses reasonably related to the development and submission of information under a Federal law* which regulates the manufacture, use, or sale of drugs or veterinary biological products.

35 U.S.C. § 271(e)(1) (emphasis added). In establishing this exception to patent infringement, Congress sought to eliminate unintended patent-term extension by "allow[ing] competitors, prior to the expiration of a patent, to engage in otherwise infringing activities necessary to obtain regulatory approval." *Eli Lilly*, 496 U.S. at 671; *see Proveris Sci. Corp. v. Innovasystems, Inc.*, 536 F.3d 1256, 1261 (Fed. Cir. 2008) ("The basic idea behind [the Safe Harbor] was to allow competitors to begin the regulatory approval process while the patent was still in force, followed by market entry immediately upon patent expiration.").

The Safe Harbor is generally understood to be an affirmative defense. *See Wilson Wolf Mfg. Corp. v. Sarepta Therapeutics, Inc.*, 2020 WL 7771039, at *4 (D. Del. Dec. 30, 2020). For the Safe Harbor to apply, the alleged infringer must be: (1) making, using, offering to sell, or selling a "patented invention" (2) "reasonably related" to the FDA approval process. *See Proveris*, 536 F.3d at 1261. If the complaint makes adequate contrary allegations, then dismissal is not appropriate. Here, BlueAllele sufficiently alleged that some of Intellia's activities did not involve "patented inventions" that are "reasonably related" to FDA submission.

### A. BlueAllele plausibly alleges that some of Intellia's uses did not involve a "patented invention."

Although the Safe Harbor "provides a wide berth for the use of patented drugs in activities related to the federal regulatory process," some activities remain outside its protection. *Momenta Pharms., Inc. v. Teva Pharms. USA Inc.*, 809 F.3d 610, 619 (Fed. Cir. 2015). Specifically, "research tools or devices that are not themselves subject to FDA approval" may

4

not be "patented inventions" as the statute refers to them. *Id.* (citing *Proveris*, 536 F.3d at 1265-66). That statement probably does not make much sense in a vacuum occupied by only the statutory language and logic,[2] but, long story short, the Supreme Court conducted a comprehensive construction of the phrase "patented invention" in the full context of the Hatch-Waxman Act and concluded that it refers to instrumentalities both subject to premarket approval and eligible for patent term extension. *Eli Lilly*, 496 U.S. at 673-74; *but see AbTox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1028-29 (Fed. Cir. 1997) (extending "patented invention" to any medical device regardless of its eligibility for patent term extension). The Federal Circuit later drew the inverse conclusion as well: a product "***not*** subject to a required FDCA approval process" is ***not*** a "patented invention." *Proveris*, 536 F.3d at 1265-66 (emphasis added).

Here, BlueAllele alleges that Intellia uses BDITs as research tools as part of manufacturing and identifying potential therapeutic candidates. BlueAllele alleged facts — that we do not deem conclusory — that Intellia used BDIT as a research tool in manufacturing. *E.g.,* DI 1 ¶ 18 ("Intellia collaborates with other entities to develop therapeutics utilizing Intellia's technology, including the use of [BDIT]."); *id.* at ¶ 19 ("Intellia uses the [BDIT] platform in the experimentation, basic research, identification, and development of potential in vivo therapeutics."); *id.* at ¶ 20 ("Intellia's infringement results, at least in part, from . . . using and making of circular plasmids that comprise [BDITs] that are used as tools for manufacturing of therapeutic candidates."). Nothing more is required to survive dismissal on that point.

There is a curious wrinkle here. As Intellia strenuously argued, and BlueAllele counsel

---

[2] "As far as the text [of the Safe Harbor] is concerned, . . . [it] is not plainly comprehensible on anyone's view." *Eli Lilly*, 496 U.S. at 669. Just so.

acknowledged at oral argument, BDITs present a tricky fact pattern. When BDITs are used as a research tool, it is said, the BDITs of interest may also become part of the therapeutic system. According to Intellia, that means BDITs check the patented invention box even when being used as research tools. We appreciate the point of the argument, but it cannot be resolved on a motion to dismiss because the allegations do not clearly make out Intellia's affirmative defense under the Safe Harbor. There may be some logical way to distinguish early-stage manufacturing and research uses as BlueAllele suggests, or perhaps Intellia is correct — but that decision needs to be made on a complete factual record rather than hypotheticals and documents with which we have no help interpreting. This is especially true in light of the purpose-driven interpretation of the Safe Harbor advanced by the Supreme Court and Federal Circuit in *Eli Lilly* and *Proveris*.

Accordingly, we conclude that at least some of BlueAllele's allegations related to Intellia's use of BDITs as tools in research and manufacturing are outside the Safe Harbor's "patented invention[s]."

### B. BlueAllele plausibly alleges that some of Intellia's uses are not "reasonably related" to FDA approval.

Setting aside the "patented invention" requirement, the Safe Harbor further applies only when "there is a reasonable basis for believing that the use of the patented invention will produce the types of information that are relevant to an FDA submission." *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1338 (Fed. Cir. 2019) (quotation and citation omitted). In assessing whether uses are "reasonably related" to FDA submission, "[e]ach of the accused activities must be evaluated separately." *Id.* (quoting *Merck KGaA v. Integra Lifesciences I, Ltd.*, 545 U.S. 193, 200 (2005)). The controlling inquiry is whether there is a "reasonable basis" for identifying the therapeutic as working "through a particular biological process, to produce a particular physiological effect."

6

*Merck*, 545 U.S. at 207.  However, the Safe Harbor "does not globally embrace all experimental activity that at some point, however attenuated, may lead to an FDA approval process." *Id.* at 205 (quoting *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 867 (Fed. Cir. 2003)).

BlueAllele alleges that Intellia uses BDITs for basic scientific research and for commercial purposes not related to FDA submission.  DI 1 at ¶ 18 ("Intellia engages in the business of basic research and development of genome editing technologies."); *id.* at ¶ 19 ("Intellia uses the [BDIT] platform in the experimentation, basic research, identification, and development of potential in vivo therpaeutics."); *id.* at ¶ 20 ("Intellia's infringement results, at least in part, from its experimenting, basic research, identification, optimizing, manufacturing, using and making of [BDIT]."); *id.* at ¶ 25 ("[T]he methods claimed in the '756 Patent, and the compositions of matter claimed in the '930 Patent and '407 Patent, are being infringed by Intellia for the experimentation, basic research, identification, and development of additional in vivo therapeutics."); *see also* DI 1-4 at 10; D.I. 1-7 at 5.  Moreover, BlueAllele alleges that Intellia used BDITs for commercial purposes not related to FDA submission.  *See* DI 1 at ¶¶ 23, 24, 26, 28.  As with any other affirmative defense, we will evaluate whether the allegations foreclose any possibility other than that the alleged acts were reasonably related to FDA submission.

According to Intellia, we may know for certain that its acts related to FDA submission because "Intellia developed therapeutic BDITs years before BlueAllele's patents issued." DI 30 at 1.  Hence, Intellia's more recent acts were surely related to FDA submission and not basic research. *Id*.  That argument seems fairly logical, but even so, we cannot agree with it unless we resolve factual disputes against BlueAllele, which we may not do.

BlueAllele need allege only that some of Intellia's use of BDITs are not for FDA

7

approval. BlueAllele did so at least by alleging that Intellia used BDITs in a commercial agreement with Regeneron for "basic research." DI 1 ¶¶ 23, 24, 26, 28. Intellia argues that the agreement was executed prior to the issuance of the asserted patents and, in the intervening years, Intellia demonstrated that BDITs work and has since moved on to obtaining FDA approval. DI 30 at 6-7. Intellia invites the Court to conclude that the collaboration for target selection alleged in the complaint ceased before the patents issued, and Intellia now uses BDITs only for late-stage development of therapies for FDA approval. *Id.*; *see also id.* at 2-3. But, again, we may not adopt the movant's view of the facts on a motion to dismiss. *See* DI 1 ¶ 24; DI 1-4 at 42 (listing "potential future candidates").

As such, we conclude that BlueAllele plausibly alleges that some of Intellia's accused activities involved basic research not "reasonably related" to FDA approval. And, for either that reason or under the "patented invention" prong, Intellia failed to demonstrate that the facts alleged by BlueAllele in the complaint immunize Intellia's accused acts.

### IV.    Conclusion

For the reasons set out above, we conclude that Intellia did not demonstrate its entitlement to the Safe Harbor as a matter of law, and we **DENY** Intellia's motion to dismiss for failure to state a claim.